UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | |
| DAMON CARTER, JR. | NO. 22-00075-BAJ-EWD |

**RULING AND ORDER**

Defendant is charged with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1). Now before the Court is Defendant's **Motion To Suppress (Doc. 25),** seeking to suppress physical evidence—the firearm—and Defendant's statements made to law enforcement at the time of his arrest at a residence that is not his own. (Doc. 25, p. 1).

The Government filed an opposition to Defendant's Motion, (Doc. 27), and Defendant filed a Reply, (Doc. 33). Following an evidentiary hearing on the Motion on March 30, 2023, the parties were permitted to file simultaneous post-hearing briefs. (Docs. 41–42). For the reasons stated herein, Defendant's Motion is **DENIED**.

I.   BACKGROUND

A. History of 205 Taft Street

On June 21, 2022, Defendant was arrested at 205 Taft Street, near the intersection of Taft Street and Highland Road, in Baton Rouge, Louisiana. In the months preceding his arrest, at least three shootings occurred in the area. (Transcript, April 17, 2023, Evidentiary Hearing, Doc. 40, ("Tr.") pp. 58–59). In the

first shooting, an unidentified man shot at nearby businesses. (Tr. p. 58). The second shooting occurred in front of 205 Taft, and one of the bullets went through the window of a nearby business, striking an innocent employee. (Tr. p. 59). The third shooting, on March 18, 2022, also occurred in front of 205 Taft, and resulted in injuries to a man waiting for an ambulance outside the residence. (Tr. pp. 59, 62). In addition to the shootings, investigators with the Alcohol, Tobacco, and Firearms Task Force ("ATF") found posts on social media where multiple individuals were posting images and videos with Glock switches[1] in a vacant lot next to 205 Taft. (*See* Tr. p. 63).

Clairmont Edwards owns the residence at 205 Taft Street and resides on the premises. (*See* Tr. p. 19). At the hearing on Defendant's motion, Edwards testified that he has known Defendant since Defendant was a child. (Tr. p. 21). Despite not being related by blood, Edwards grew up with Defendant's aunts and uncles, and he has always thought of Defendant as his nephew. (*See* Tr. pp. 21, 28–29). Defendant has been to 205 Taft "many, many" times over the years, even though Defendant has never slept over at the residence. (Tr. pp. 22, 29). Defendant sometimes takes care of Edwards and helps around the house. (Tr. pp. 22, 29). To Edwards, Defendant has "always been a part of [his] household." (Tr. p. 22).

Despite Edwards's relationship with Defendant, Edwards previously put up several "no trespassing" signs on his property in response to people coming onto his yard without his permission. (*See* Tr. p. 30).

---

[1] A glock switch is a device "that allows a conventional semi-automatic Glock pistol to function as a fully automatic firearm." *Internet Arms Trafficking*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, https://www.atf.gov/our-history/internet-arms-trafficking (last reviewed May 15, 2020).

2

While investigating the three prior shootings near 205 Taft Street, many of the same police officers who would become involved in the instant case grew familiar with both the residence at 205 Taft and Edwards. Many of them because so acquainted with Edwards that they refer to him by his nickname, "Dankey." (Tr. pp. 19–20).

For instance, Agent Jordon Lear of the ATF spoke with Edwards inside the 205 Taft residence following the March 18, 2022, shooting. (Tr. p. 62). Sergeant David Kennedy had previous contact with Edwards on at least four or five other occasions. (Tr. p. 102). Sergeant Jesse Barcelona had previously spoken with Edwards and conducted several prior investigations at the address. (Tr. p. 150).

It is not exactly clear what authority Edwards may have previously given officers to apprehend any persons on his property. At the hearing, Edwards testified that Defendant had permission to be on his property, (Tr. p. 35), that Defendant was always welcome at the residence, (Tr. pp. 24–26), and that the officers did not have permission to be on his property, (Tr. pp. 35–36). On the day of the arrest, when approached by officers, Edwards stated that he did not know that anyone was outside of his residence. (Tr. pp. 113–15).

However, Agent Lear, Sergeant Kennedy, and Sergeant Barcelona believed, from their prior interactions with Edwards, that Edwards was concerned with the presence of trespassers at 205 Taft. (*See* Tr. pp. 72, 102–03, 117–18). Agent Lear testified that Edwards had previously told officers that he did not "want the youngsters hanging out because they were causing the shootings." (Tr. p. 72). Sergeant Kennedy testified that he talks to Edwards about the trespassers "every

3

time" he is at 205 Taft. (*See* Tr. pp. 102–03). Sergeant Kennedy also stated that Edwards previously told him that if he passed by Edwards's house and there were people in front of the house without Edwards there, that the Sergeant should remove them from the property. (Tr. pp. 117–118). Sergeant Barcelona testified that, on the day of the arrest and after Defendant was put into a police vehicle, Edwards confirmed him that no one was supposed to be on the property. (Tr. p. 157).

### B. Establishment of the Covert Camera

Agent Lear, concerned with the shootings in the area and the social media posts, considered the vicinity to be a high-crime area and requested a covert camera be placed in the area. (Tr. p. 63). Such a covert camera cannot be seen from out in the open; it is in a concealed box that looks like other objects placed on top of a telephone pole. (Tr. pp. 63–64).

Agent Lear requested the covert camera in June 2022, and it was installed sometime before June 21, 2022. (Tr. pp. 63–64). The camera was placed on the corner of Highland Road and Taft Street, with a view of 205 Taft. (Tr. p. 64). The camera was installed approximately 200–250 yards from the residence. (Tr. p. 67). It was equipped with a 20-time optical zoom and filmed in color. (Tr. pp. 76, 82).

The camera sent out a live feed and could also be recorded. (Tr. p. 65). Agent Lear was the officer responsible for monitoring the camera, although other officers had access to the live feed. (Tr. pp. 64–65). "Like any typical surveillance system," Agent Lear was able to view multiple cameras simultaneously on his cell phone. (Tr. pp. 65, 66).

### C. June 21, 2022, Observations

On June 21, 2022, Agent Lear was notified that another camera—unrelated to this event—had been installed. (Tr. p. 65). Once a camera is put up for the first time, Agent Lear seeks to ensure that the new camera is pointing towards and focused on the intended target location. (*See* Tr. p. 74). On that date, he pulled up all of the cameras on his cell phone to see the view of the newly installed camera.[2] (Tr. p. 65).

When he did so, viewing the Highland and Taft camera, Agent Lear saw a person in front of the residence at 205 Taft who appeared to be holding a gun. (Tr. pp. 65–66). Continuing to watch and making the live feed full screen on his phone, Agent Lear saw a black male walking from a chair in front of the residence to the roadway, holding a gun in his right hand. (Tr. pp. 66, 77). The man was "jiggling" the purported firearm in the air and swinging it around. (Tr. p. 67). Agent Lear had no doubt that it was a firearm. (Tr. p. 66). It looked, to Agent Lear, like the man was gesturing to someone across the street, although he could only see the one man. (Tr. p. 67). Agent Lear continued to watch the man through the live feed. (Tr. p. 68). He observed that the man would walk between the roadway, the chair, and a trailer under the carport. (*See* Tr. p. 68).

Agent Lear then called Sergeant David Kennedy of the Street Crimes Unit and informed him of what he saw. (Tr. pp. 67–68). Sergeant Kennedy told Agent Lear that he would drive to 205 Taft. (Tr. p. 68).

---

[2] Agent Lear testified that he was viewing between two and six cameras simultaneously through his iPhone (Tr. pp. 66 ("... [Y]ou can have multiple cameras on one screen, like four or six."); 75 ("It was either two or four. I can't remember at that time how many they had.")).

5

Agent Lear continued giving Sergeant Kennedy a "play-by-play" of what the man was doing while Sergeant Kennedy and other officers were *en route*. (Tr. pp. 68–69, 111). Agent Lear stopped monitoring the camera only when Sergeant Kennedy and the other officers arrived. (Tr. p. 69). In total, Agent Lear observed the live feed for approximately 20–25 minutes. (Tr. p. 97). Agent Lear did not see the firearm again while monitoring the feed. (Tr. 68).

Even though Agent Lear had the ability to record the relevant live feed video, he failed to do so. (Tr. p. 69). Agent Lear was unable to download the video while he was "off-site," but could have downloaded the video once he returned to the office. (Tr. p. 69). Approximately two weeks later, the video would be overwritten as a matter of course. (Tr. p. 69). However, with "the workload and everything else going on at the time," Agent Lear neglected to download the video before it was overwritten. (Tr. p. 69). Agent Lear assumed that everything relevant to the contact and investigation would be documented on the body-worn camera of the responding officers and failed to realize how critical the covert camera video would be to the investigation. (Tr. p. 79).

### D. Officers' Investigation

After receiving the first phone call from Agent Lear, Sergeant Kennedy, Corporal Steven Nevels, and Sergeant Barcelona drove to 205 Taft from the Baton Rouge Police Department office on Scenic Highway. (*See* Tr. pp. 104–05). Sergeant Kennedy told the other officers "the bare minimum"—that they were headed to 205 Taft Street, where a man was in front of the house with a firearm at a residence where

6

individuals were known to trespass.³ (*See* Tr. p. 106).

The three officers arrived at the house in three separate unmarked Dodge Chargers.⁴ (*See* Tr. pp. 106–07, 152). Corporal Nevels parked in front of the house and Sergeant Kennedy parked his vehicle slightly ahead to block a silver car⁵ in front of the west side of the residence. (Tr. pp. 111–12, 124). The officers were in full uniform. (*See* Tr. p. 186). Sergeant Kennedy and Corporal Nevels approached the house together,⁶ with Sergeant Kennedy positioning himself towards the carport on the west side of the home and Corporal Nevels approaching the Defendant, who was seated on the front porch. (*See* Tr. p. 112). Sergeant Barcelona arrived about 30 seconds after the other officers. (*See* Tr. p. 152).

Upon exiting his vehicle, Corporal Nevels saw Defendant sitting in a chair in front of the home. (Tr. p. 175). Corporal Nevels also saw a firearm underneath the chair. (Tr. p. 175). The officer testified that there was no obstruction that prevented him from seeing Defendant. (Tr. p. 177).

Immediately upon contacting Defendant, Corporal Nevels asked him to stand. (Tr. p. 177). The officer then placed Defendant in handcuffs. (Tr. p. 177). Defendant was advised of his *Miranda* rights and Corporal Nevels placed Defendant in a police vehicle. (Tr. pp. 177–78).

---

³ Corporal Nevels testified similarly: that Sergeant Kennedy received a call indicating that the officers needed to go to 205 Taft Street, where a man was outside the residence with a firearm. (*See* Tr. p. 173).
⁴ Sergeant Kennedy testified that people in the community can generally recognize the Chargers as police units. (Tr. p. 120).
⁵ The officers later determined that the silver car belonged to Defendant. (Tr. 115–16).
⁶ Defendant describes this approach as a "pincer movement." (Doc. 25-1, p. 4).

7

The officers recovered the firearm. Immediately thereafter, Defendant gave incriminating statements to the officers regarding his possession of the firearm and his prior felony conviction.[7] The seized firearm and the statements are the subject of Defendant's Motion.

## II. DISCUSSION

### A. Legal Standard

It is well established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation marks omitted) (quoting *Katz v. United States*, 389 U.S. 347, 356 (1967)). Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that that evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)). However, in cases where a search is not conducted pursuant to a warrant, the Government bears the burden of proving that the search was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Castro*, 166 F.3d 728, 733 n.6 (5th Cir. 1999)).

---

[7] Defendant confirmed that the recovered firearm was his, that he "bought it off the streets for $150," that he was a convicted felon, and that he would likely face consequences for being a convicted felon in possession of a firearm. (Gov. Ex. 5, 3:00–4:35).

8

### B. Standing

Standing is a central component of Fourth Amendment jurisprudence. *United States v. Powell*, 732 F.3d 361, 374 (5th Cir. 2013). "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Id.*; *see also Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (quoting *Brown v. United States*, 411 U.S. 223, 230 (1973)) (citations omitted). Therefore, generally, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134 (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969)).

The Government argues that the Court should deny the Motion because Defendant lacks standing to challenge the search and seizure of the firearm. (Doc. 27, p. 3). The Government contends that Defendant had no possessory or proprietary interest in where the firearm was seized—205 Taft Street—and that Defendant and the firearm were "clearly visible" from the street.[8] (*See* Doc. 27, p. 4). Thus, the Government argues, Defendant did not have an actual, subjective expectation of privacy. (Doc. 27, p. 4).

To establish standing to challenge illegally obtained evidence, a defendant must have an actual and reasonable expectation of privacy in the area searched or the evidence seized. *Minnesota v. Carter*, 525 U.S. 83, 91 (1998). Such standing

---

[8] In the Court's view, the Government's argument relies on the theory that the Defendant was in "constructive possession" of the firearm. To conclude otherwise would have the Court need to determine whether the firearm was "abandoned property," such that it had no owner.

9

depends on "1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and 2) whether that expectation of privacy is one which society would recognize as [objectively] reasonable." *United States v. Iraheta*, 764 F.3d 455, 461 (5th Cir. 2014) (citing *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037–38) (5th Cir. 1990)). The burden of establishing standing is on the mover of the suppression motion. *Rakas*, 439 U.S. at 130, n.1.

The Fifth Circuit has identified several factors to consider when determining if a reasonable expectation of privacy exists. The Court should consider "(a) Whether the defendant has a [property or] possessory interest in the thing seized or the place searched; (b) whether he has a right to exclude others from that place; (c) whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion; (d) whether he took normal precautions to maintain privacy; and (e) whether he was legitimately on the premises." *United States v. Cardoza-Hinojosa*, 140 F.3d 610, 615 (5th Cir. 1998) (citations omitted). "While no one of these factors is necessarily decisive, together they represent the concerns that should be addressed in determining whether a defendant has standing to object to a search under the Fourth Amendment." *Id.* at 616.

Paramount to the Court's determination of Defendant's standing is the testimony by and about Edwards, the homeowner. The Court finds that the officers testified credibly relative to their beliefs that Edwards was concerned with trespassers on his property. Concerning Edwards testimony, while it is clear that

Edwards and Defendant know each other and have enjoyed a close relationship for several years,[9] the Court finds Edwards testimony not credible. Edwards prior statements to officers, his actions on the day of Defendant's arrest, and his testimony at the hearing are inconsistent, and the Court finds that Edwards's testimony at the hearing conveniently served the interests of the Defendant.

Without credible testimony or evidence to support Defendant's reasonable expectation of privacy in the residence, the Court finds that Defendant did not meet his burden of proving that, on June 21, 2022, he was legitimately on the premises and that he does not have standing to challenge the seizure of the firearm.

However, even if the Court found that Defendant had standing under the *Cardoza-Hinojosa* factors, Defendant's motion to suppress would still fail because the officers' seizure of Defendant was justified.

### C. Seizure and Reasonable Suspicion

Generally, police officers may briefly detain a person, without probable cause, as long as the officers have a reasonable suspicion that the person has committed, or is about to commit, a crime. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 22 (1968). Such a limited investigatory stop may still amount to a "seizure" within the meaning of the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Some examples of behavior by officers that might constitute a seizure—even if the defendant does not actually

---

[9] Edwards testified that he has always thought of Defendant as his nephew, despite not having a blood relation. (*See* Tr. pp. 21, 28–29).

11

attempt to leave—are the number of officers present, whether they appear threatening, whether they are in uniform, or whether their language or tone of voice indicates that compliance with requests might be compelled. *See id.* at 554–55.

Such a seizure must be "justified at its inception." *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020) (quoting *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004)). The officers' actions must also be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20; *see also United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013). Reasonable suspicion must be present "*before* the initiation of an investigatory detention." *McKinney*, 980 F.3d at 490 (citing *United States v. Monsivais*, 848 F.3d 353, 359 (5th Cir. 2017) (emphasis in original)). If the officer can "point to specific and articulable facts that [led] him to reasonably suspect that a particular person is committing, or is about to commit, a crime," then reasonable suspicion existed. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). The Court should consider the totality of the circumstances leading up to the arrest to assess the purported reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *Hill*, 752 F.3d at 1033 (5th Cir. 2014).

### 1. Seizure

The Court easily determines that Defendant was seized by officers immediately upon their arrival at 205 Taft Street. From the point of view of Defendant, while he was seated on the porch, two police vehicles—suddenly and seemingly out of nowhere—parked in front of the residence, blocking his vehicle.[10]

---

[10] They did not, however, know that the vehicle belonged to Defendant before Defendant's arrest. (*See generally* Tr. pp. 115–16).

12

(*See* Tr. pp. 111–12, 124). A third police vehicle arrived about thirty seconds later. (*See* Tr. p. 152). The officers, dressed in uniform, exited their vehicles. (*See* Tr. p. 186). They spread out and approached the home together, with one officer walking directly to Defendant. (See Tr. p. 112). Immediately, the officer instructed Defendant to stand up, placed him in handcuffs, and advised him of his *Miranda* rights. (*See* Tr. pp. 177–78). Within a matter of moments, Defendant was seated in the back of a police car. (*See* Tr. pp. 177–78).

The Court finds that a reasonable person in the same situation as Defendant would not believe that he was free to leave. In fact, the officers testified that once they arrived, they would not have permitted Defendant to leave. (*See* Tr. pp. 124, 183). Defendant was seized by the officers immediately upon their arrival to the residence.

### 2. Reasonable Suspicion

The Court also finds that the officers' immediate seizure of Defendant was justified by reasonable suspicion from the outset.

Agent Lear was the first officer to observe Defendant on June 21, 2022. (*See* Tr. p. 65). Agent Lear saw Defendant, via covert camera, "jiggling" and "swinging around" a firearm, walking back and forth between the roadway, the carport, and a chair on the front porch. (Tr. pp. 65–67). It appeared to Agent Lear that Defendant was gesturing to someone who was outside of the camera's view. (Tr. p. 67). And Agent Lear—as the officer who requested the covert camera to be directed specifically towards 205 Taft Street because it was a high-crime area—recalled all of the prior

incidents near the residence, the social media posts about glock switches, and his prior conversations with Edwards, the homeowner, about trespassers. (*See* Tr. pp. 58–64). Based on these observations, Agent Lear was reasonably suspicious of criminal activity by "youngsters hanging out" on the premises of 205 Taft Street.[11]

### 3. Knowledge of Other Investigating Officers

After observing the suspicious behavior, however, Agent Lear did not, himself, respond to 205 Taft Street. Instead, Sergeant Kennedy, Corporal Nevels, and Sergeant Barcelona were the responding officers. (*See* Tr. 68–69).

Generally, under the "collective knowledge doctrine," an actual arresting officer need not know all of the facts amounting to probable cause so long as there is some degree of communication between the arresting officer and an officer who knows the necessary facts. *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007) (citing *Kye Soo Lee*, 962 F.2d at 435). However, in this case, the Court need not engage in an analysis of the "collective knowledge doctrine" because all four of the officers testified credibly to essentially the same set of information: that Agent Lear notified Sergeant Kennedy, who notified Sergeant Barcelona and Corporal Nevels, that there was an individual with a firearm possibly selling drugs in front of the residence at 205 Taft Street. (*See* Tr. pp. 105, 142, 150, 159, 182). Sergeants Kennedy and Barcelona, who

---

[11] (*See* Tr. pp. 65–69, 78–79). Agent Lear testified at the hearing that Defendant may not have been charged with crimes had nothing further resulted from the investigation. (*See* Tr. p. 78). However, when Agent Lear notified Sergeant Kennedy of what he observed, who relayed the information to Sergeant Barcelona and Corporal Nevels, Agent Lear advised him that Defendant was engaging in suspicious behavior—moving around the front of the previously-known residence while holding a firearm and possibly selling narcotics. (*See* Tr. pp. 105, 142, 150, 159, 182). Criminal trespass, selling illicit drugs, and flashing a firearm could all be considered criminal behavior.

14

were supervising Corporal Nevels on June 21, 2022, had extensive knowledge of 205 Taft Street, the homeowner, and the prior reported incidents from that area. (*See* Tr. pp. 101–03, 150). Thus, the Court concludes that the "collective knowledge doctrine" is inapplicable here because there was no relevant disparity in information between the officers.

Considering the totality of the circumstances, the Court finds that Agent Lear and the other investigating officers specifically articulated facts that led them to reasonable suspect that Defendant was committing, or was about to commit, a crime. *See Hill*, 752 F.3d at 1033.

In light of the foregoing, and considering that the firearm was in plain view of Corporal Nevels upon his arrival at 205 Taft when he approached the Defendant, (Tr. pp. 175, 177), the Court finds that the seizure of the firearm was justified.

### D. Defendant's Statements

Having determined that the seizure of the firearm was justified, the Court now turns to Defendant's challenge of his statements made to officers. Once placed inside the police unit, and after having acknowledged that he understood the *Miranda* warning, Defendant allegedly made incriminating statements. Officer Nevels asked Defendant if he had any other guns around, to which Defendant replied, "[t]hat's the only thing I had on me." (Gov. Ex. 5, 3:00–4:35). When asked where he got the firearm from, Defendant stated that he's "been having the gun," and that he "bought it off the streets for $150." (Gov. Ex. 5, 3:00–4:35). Defendant also, of his own volition, volunteered that he was a convicted felon, that would likely be facing a charge as a

convicted felon in possession of a firearm, and asked Officer Nevels what kind of consequences he would face. (Gov. Ex. 5, 3:00–4:35).

Generally, "statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will." *Florida v. Royer*, 460 U.S. 491, 501 (1983) (citing *Dunaway v. New York*, 442 U.S. 200, 218–19 (1979); *Brown v. Illinois*, 422 U.S. 590, 601–02 (1975)).

A *Miranda* warning, which may impact whether a statement was given voluntarily, is only required to be administered when a defendant is subject to "custodial interrogation." *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). The Defendant generally bears the burden of showing that he was subjected to custodial interrogation. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977); *United States v. Charles*, 738 F.2d 686, 691–92 (5th Cir. 1984) (internal citations omitted). In determining whether a custodial interrogation took place, the Court must consider both the freedom of movement of Defendant and whether the interrogation took place in a "station-house environment." *United States v. Coulter*, 41 F.4th 451, 457–58 (5th Cir. 2022).

The Court finds that Defendant has clearly established that he was subject to a custodial interrogation that was tantamount to a station-house environment. At the time the statements were given, Defendant was seated in the back of a police unit, handcuffed, with at least three police officers nearby, without the presence of a

lawyer. (*See* Tr. pp. 111–12, 124, 177–78, 186).

However, even if Defendant was subjected to such an interrogation, his Fourth Amendment rights were not violated because the credible and uncontroverted evidence revealed that Corporal Nevels administered the *Miranda* warnings to Defendant prior to escorting him to the police unit. Despite not having an active body-worn camera on June 21, 2022, (Tr. pp. 173–75, 179), Corporal Nevels testified that he advised Defendant of his *Miranda* rights prior to placing him in the police vehicle, where the incriminating statements were uttered. (Tr. pp. 177–78). Sergeant Kennedy confirmed that he heard Corporal Nevels administer the warning while Corporal Nevels was escorting the Defendant to the police vehicle. (*See* Tr. pp. 129–30). The Court finds the testimony of the officers credible and determines that the *Miranda* warning was properly issued to Defendant prior to Defendant making any statements. Therefore, any such statements were given voluntarily by Defendant and with the full knowledge that such statements could be offered in a future prosecution against him.

## III.  CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's **Motion To Suppress (Doc. 25)** be and is hereby **DENIED**.

Baton Rouge, Louisiana, this 20th day of July, 2023

_____
**JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**